This action was brought to set aside two deeds for three tracts of land: (1) The B. F. Lamb Home Place, containing 30 acres. (2) The swamp land containing 210 acres, and (3) the pocosin land containing 110 acres. The deeds were made by the plaintiff to the defendants for one-fourth interest in the said lands, which plaintiff inherited from his father. It was alleged in the complaint that the deeds were void by reason (1) of the mental incapacity of the plaintiff, and (2) undue influence exerted by the defendants before and at the time of their execution. There was evidence that the lands were worth from $8,000 to $35,000, the witnesses greatly varying in their estimates between those two figures. It also appeared, if the evidence is to be believed, that the plaintiff has always been weak in mind and body, having suffered from paralysis in his youth, and that his body and mind have been since greatly (438) impaired by the habitual use of narcotics or "dope." The fourth interest of the plaintiff in the lands are worth from $2,000 to $8,750, and defendants gave only $1,000 for it, and that amount was payable by installments of $15 per month, and without any security, except the personal promises of the vendees, who are insolvent. At the close of the testimony, the court entered judgment of nonsuit, holding, of course, that there was no evidence to sustain either of the causes of action. It becomes necessary, therefore, to state somewhat fully the important facts which the evidence tended to prove, and this cannot be better done than by reproducing some of the language used by the witnesses.
E. G. Simpson, witness for the plaintiff, testified: "I know the three tracts of land in the two deeds; one is called `the Swamp Tract,' one the `Home Tract,' and one the `Pocosin Tract.' I have lived all my life about one mile from Belvidere. I knew Dr. Lamb and I know his children; they are Ageron, the plaintiff, Theyle, Ben and Galen. Dr. Lamb is not living. I lived at the home place three or four years. The three tracts of land, the Pocosin and the Home Place and the Swamp Tract, are worth eight or ten thousand dollars. I talked with Mr. Perry, and he told me what he paid. I came to town on one first Monday, and saw Mr. Perry at the hotel piazza, and he said: "I have been waiting for you.' I said: `The bell has rung and I have to go to the courthouse, but go ahead and I will hear what you have to say.' He said: `I have been talking of buying Ageron Charles Lamb's interest in the Dr. B. F. Lamb estate, and I would not buy it until I saw you, knowing you were Lamb's agent.' I told him that he had better not buy it; that Ageron Lamb was not competent to sell anything; I told him that he knew that he was not competent to sell anything, and that *Page 510 
if he bought the place he would buy a lawsuit, and he said that if that was the case he was not going to buy it. About three weeks or a month after I saw Mr. Perry, the defendant, again on the courthouse grounds, and he told me he had bought his (Ageron's) interest; I asked him what he paid; he told me he was to give him $1,000 in monthly installments of $15 per month. I said: `Did you give him any security?' he said, `No.' I remarked to him: `Then you assume the guardianship of Ageron. What did you mean by paying him $15 per month?' He replied to me, that he, Ageron, was not competent to take care of it, and he thought he had better pay it so he could have it monthly; he remarked that to me; he gave no security whatever for the purchase money — no note, no lien on the land. I told him he would be sued. I wrote to Mr. Theyle Lamb, his brother, next day, that he might take up the matter and bring suit; the next news I got was from Judge Ward, who wrote me a letter that he was wanted to bring suit, (439) and that the court had appointed me to bring suit, as next friend of Ageron. I then talked with Ageron, and he told me to bring suit. I have been agent for Theyle Lamb, I suppose, something like eight or ten years, or longer, and for his father before him; none of them have lived here in a good long time, except Ageron; I lived at the old home place two or three years before Dr. Lamb died, and I looked after it for Ageron and the others. Have known Ageron all my life; he is some forty or more. His mental capacity was weak to begin with, and has grown weaker; he has never had a bright mind, in my opinion, and has grown weaker from the use of dope. He has taken morphine and laudanum in large quantities; he has been an habitual user of morphine and laudanum for eight years, to my knowledge; he had affliction when he was a child — suffered with a stroke of paralysis, and one leg is a little shorter than the other, and one arm a little shorter than the other, and it affected his whole side. He does not seem to have any regard for the value of anything; he will sell anything for one-half its value, or less; he does not seem to know the value of things. I knew him to sell a horse, worth $150, for $15. It put me to some trouble to get it back; I sent the man word that I would get out claim and delivery papers, and he sent me the horse; and many other things he would sell that way; I knew him to sell a cow and calf for $3; I got the cow and calf back; I knew him to sell a good cow for $5. He has been living at the Lamb place for eight years, or more; he is there now; has been there ever since his father died; been fed and clothed by his relatives, at the instance of his brother. A Mr. Chappell is in charge there now, taking care of him; George Hunter was there before; he stayed there when Mr. Wooten lived there, four, or five, or six years; he has stayed and subsisted at *Page 511 
the Home Place a large part of his life; he does not work any; he has been taken care of by his folks all the time; he has been married twice, to my knowledge, and divorced both times; both of his wives were women of the `underworld.' I knew him about the time he made these deeds. I do not think he had any reasonable judgment of value. I do not think he has ever been competent to sell or transact any business."
By the Court: Do you mean in his life? A. Never since I have known him, and he has been worse for the last eight years than he was before. He would know that he owned a piece of land. Q. What would you say as to whether or not he had mental capacity enough to know if he made a deed, or when he made the deed in question? What would you say as to whether or not he knew what he had; what land he was conveying, to whom he was conveying it, and the scope and effect of the deed of conveyance? I ask you what would you say as to whether or not he would have any reasonable judgment as to what he was doing? A. No, sir.
W. N. Wooten, witness for the plaintiff, testified: "I have (440) known Ageron Charles Lamb since his birth until today; I have lived where he was; I have had him under my control for five years, or nearly so. Dr. Lamb, his father, married a lady in Pittsburg; at that time he had all the children with him except Ageron; after his marriage he came back to fix his business in the condition he wanted it, and he came to me and wanted me to run his place, the old homestead, where Ageron now lives, and he got after me to lease his place for five years; that he had married away and was going to rent it, and we bargained and wrote it in the lease that I was to board Ageron at so much per month; he also stated that as to Ageron's condition, he could not control him in the city, and he had to leave him in the country where he could have some one to look after him, and he stayed with me nearly five years. During that five years he married once, was divorced, and has married since and divorced again. He stayed with me a part of the time and part of the time he loafed about; his father directed that he was to go to school; he went a while and finally quit; I could not prevail with him to go.
"I do not consider he has any mind at all for any business; there is no business capacity about him; he is not competent to do any business."
"Q. What do you say as to whether he had any reasonable judgment of things then? A. He never had.
"Q. In what way did he manifest this imbecility? A. He seemed to have no reason and no judgment; you couldn't tell him anything.
"Q. Couldn't he comprehend? A. No, sir. I have observed him of late years. I see him sometimes every day. I know nothing of his *Page 512 
moral habits than what he told me; when he lived with me he did not use it (morphine). I never could tell the difference; didn't know when he was using it and when he wasn't; he came to me to borrow $2, and I told him I didn't have any money to lend, and he said his brother hadn't sent any that week; `Reckon he thinks I have a bad practice.' I asked him how much money it would take to keep him in morphine a week.
"Q. What would you say about him now, last year, at the time he made these deeds, whether or not he had mind enough to know the scope and effect of what he was doing? A. I would not say he did.
"Q. You would say he didn't? A. Yes, I would.
"Q. What would you say about whether he had any judgment of things, prices and value? A. I say he is not able to judge anything.
"Q. What would you say about whether he had mind enough to know what he had; if he was making a deed, what he was putting in the deed, to whom he was making the deed, and the general scope and (441) effect of the deed; whether or not he has reasonable judgment of the values of property? A. No; I would not think so.
"Q. Do you think he would, if he had made a deed, know what land he was conveying? A. He wouldn't hardly know.
"Q. Would he know to whom he was conveying? A. I think he would probably know who.
"Q. What land he was conveying? A. I really do not; I cannot answer that; he didn't know what the value of the land was. I know the three tracts of land, Home Tract, Pocosin Tract, and tract called Swamp Tract. I have plowed every row on the Home Farm; I think I know something about the value of land; and I would consider that, at a low estimate, in its present condition, the whole was worth at least $10,000; one of the biggest houses in the neighborhood, old-timely house, built in olden times, built out of nails made in a blacksmith shop, all heart timber and the largest house and best house in the place, is the house on the land in question; land is very valuable around there. The Home Place is worth $100 an acre; it is about one-half mile from Belvidere; the Pocosin land is worth about $50 an acre, and the Swamp tract $100 an acre, I should think; putting it at all this, it would make $35,000. I would say that the $10,000 was a very low estimate — I stated in its present condition."
J. H. Smith testified that he had known plaintiff from his youth, about 35 years, and that his mind is not right, and has been enfeebled still more by the excessive use of morphine; that he has not been mentally able to attend to business; would sell his property for most anything he could get for it and for much less than it was worth; he had no idea of values, and did not seem to know the value of the property *Page 513 
he was selling to defendants. He also stated that plaintiff did not have sufficient mind to know the scope and effect of the deed; had no reasonable judgment about it and no idea of its general value, nor did he know what property he had.
Dr. R. W. Smith testified that plaintiff habitually uses morphine and "from a mental and physical standpoint is a wreck, and had not reasonable judgment of things and values; he did not know what land he had; while he might know that he was conveying land to Mr. Perry and Mr. Wright, he would not understand the scope and effect of the transaction, or what he was doing from start to finish, nor would he understand whether he was getting $1,000 or $10,000 for his land — too much or too little."
There was much other evidence of the same kind as that already stated.
The defendants introduced testimony tending to contradict that of plaintiff's witnesses, and among the witnesses they called was the defendant himself, and his testimony tended to contradict that of the plaintiff's witnesses, and to show that he had mental capacity (442) sufficient to execute the deeds. He said, though, that he was addicted to the free if not excessive use of morphine, 250 tablets a week, which he took for a pain in his side, and that defendants had paid only about $40 for the land, that is, they had paid $15 twice and a few dollars at another time.
Plaintiff excepted to the judgment of nonsuit, and appealed.
After stating the case: The court having held that there was no evidence to sustain either cause of action, the one as to mental incapacity or the other as to undue influence, which is another and milder name for fraud, we must apply the familiar rule in cases of nonsuit, and construe the evidence most favorably for the plaintiff, and every fact essential to the cause of action which it tends to prove must be taken to be established, as the jury, if the case had been submitted to them, might have found the facts to be as alleged by the plaintiff and contrary to the contention and proof of the defendant. Brittain v. Westhall, 135 N.C. 492; Morton v. Lumber Co.,152 N.C. 54; Trust Co. v. Bank, 166 N.C. 112; Christman v. Hilliard,167 N.C. 4. And this rule applies in favor of the defendant where a verdict is substantially directed. Forsyth v. Oil Mill Co., 167 N.C. 179. Where the evidence is conflicting the case is one for the jury to settle the contradictions and find the facts. Alexander v. Statesville,165 N.C. 527; *Page 514 Forsyth v. Oil Mill Co., supra. It was suggested that the court was unduly impressed by the plaintiff's own testimony, which has thought to indicate the possession by him of full mental capacity and an absence of undue influence; but if that be so it was not regular for the court to isolate any particular part of the evidence and decide the case upon it alone, but the whole of the evidence must be considered, as it is eminently the province of the jury, and not of the judge, to pass upon its weight and to determine its probative force, and, for this purpose, to make the selection between that which is credible and that which is not. The defendant's testimony is only considered in order to ascertain if any of it tends to prove the plaintiff's case, and it is not at all permissible for the court to say on which side the evidence preponderates, or to decide against one party or the other according to its own conviction of what is the truth. This is precisely what our statute forbids to be done. Guano Co. v.Mercantile Co., 168 N.C. 223.
With these rules kept steadily in view, it seems to be plain that there was error in the judgment below.
We have recently considered the law as to the mental capacity required for the valid execution of a deed, and the undue influence (443) of fraud sufficient for the rescission or cancellation of a contract. Hodges v. Wilson, 165 N.C. 323; Sprinkle v. Wellborn,140 N.C. 163; Cameron v. Power Co., 138 N.C. 365.
We take the law to be settled that the mere fact that a man is of weak understanding, or is below the average of mankind in intellectual capacity, is not of itself an adequate ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance. But where mental weakness is accompanied by other inequitable incidents — such as undue influence, great ignorance and want of advice, or inadequacy of consideration — equity will interfere and grant either affirmative or defensive relief. This is the rule that is stated in Fetter on Equity, p. 143, and Eaton on Equity, p. 316. Lord Hardwicke said in Earlof Chesterfield v. Janssen, 2 Vesey, Sr., 125: "A third kind of fraud is that which may be presumed from the circumstances and conditions of the parties contracting; and this goes further than the rule of law, which is that it (fraud) must be proved, and not presumed; but it is wisely established in this Court to prevent taking surreptitious advantage of the weakness or necessity of another, which knowingly to do is equally against conscience as to take advantage of his ignorance."
Bispham on Equity (5 Ed.), sec. 230, refers to the subject in this way: "Whatever be the cause of the mental weakness — whether it arises from permanent injury to the mind, or temporary illness, or excessive old age — it will be enough to make the court scrutinize the contract with *Page 515 
a jealous eye; and any unfairness or overreaching will be promptly redressed. As has been said by the Supreme Court of the United States, `Wherever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to an absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party or his representatives or heirs, interfere and set the conveyance aside.' `The result of the decisions,' says an English chancery judge, in a modern case, `is that where a purchase is made from a poor and ignorant man at a considerable undervalue, the vendor having no independent advice, a court of equity will set the transaction aside.' A mere latent suspicion of unfairness, however, will not be enough. On the other hand, it need scarcely be remarked that the mere circumstance of old age or physical feebleness will not render a transaction fraudulent, if, in point of fact, the party is intelligent and capable." See Allore v. Jewell, 94 U.S. 511; Griffith v. Godey,113 U.S. 95, and Bispham on Equity (6 Ed.), sec. 230 (p. 333), note 4, where the cases are collected. The mental capacity required for the valid execution of a deed is the ability to understand the nature of the act in which the party is engaged and its scope and effect, or its nature and consequences not — that (444) he should be able to act wisely or discreetly, nor to drive a good bargain, but that he should be in such possession of his faculties as to enable him to know at least what he is doing and to contract understandingly. There is no particular formula to be used in such cases, as said by the Court in Morris v. Osborne, 104 N.C. 609, but the law in this respect should be explained to the jury with reference to the special and peculiar facts of the case being tried, and under the guidance of such general principles as have been settled and declared by the courts.
A want of adequate mental capacity of itself vitiates the deed, while mere mental weakness or infirmity will not do so, if sufficient intelligence remains to understand the nature, scope, and effect of the act being performed. But while this is true, weakness of mind, whether natural or induced by the excessive use of drugs or any other cause, when accompanied by such circumstances as tend to show that advantage was taken of it by the party who procured the deed, or when it appears that there is not only weakness of mind, but inadequacy of consideration, especially when it is gross, and the situation of the parties is so unequal, by reason of the weakness of the one and the mental superiority of the other, or for other reason, the jury may infer fraud, or undue influence, which in law is the same thing. Mere weakness of mind or inadequacy of price, unless the latter be such as amounts to apparent fraud, will not be sufficient to authorize the cancellation of a *Page 516 
deed, but either or both of them may be considered by the jury in ascertaining whether fraud has been practiced in obtaining the instrument. This fraud is not required to be directly established by proof, but may be inferred from all the circumstances of the case, such as weakness of mind and body, inadequacy of price, and inequality in the positions of the parties. This kind of fraud, as a fact, is not presumed, but must be established by the party who alleges it by the clear preponderance of the evidence to the satisfaction of the jury, but strong, cogent, and convincing proof of it is not required, as contended by defendant's counsel in this case. Harding v. Long, 103 N.C. 1; Hodges v. Wilson, supra;Culbreth v. Hall, 159 N.C. 588, and Fraley v. Fraley, 150 N.C. 501, where the question is fully considered by Justice Hoke, with ample reference to the authorities. Where it is proposed to change the substance of the contract by altering its terms, under the equity for correction or reformation and upon the ground of mistake or fraud, or by engrafting upon it a trust by parol, the quantum of proof is different, and the evidence must be of a more cogent and convincing nature than in the other case, because of the strong presumption that parties in the written memorial of their contract have expressed themselves as they intended to do, and more conclusive proof than is ordinarily required must be forthcoming (445) in such cases. The law, it is true, does presume, in the first instance and without proof from either side, that the execution of a deed has not been fraudulently procured, and for this reason places the burden of proof on the party alleging fraud, but this presumption is weaker than the one as to the correctness of the paper, when it is proposed to alter its terms, or to add something to it, which was not written into it by the parties, or to change or modify its terms in any essential respect.Lehew v. Hewett, 138 N.C. 6.
When we apply these well settled principles to the facts of this case, the error of the court in withdrawing the case from the jury and dismissing the action upon its own view of the facts becomes apparent.
The case is not, in principle, unlike Sprinkle v. Wellborn, supra, where it was substantially said: So weak was she as to be easily and completely subjected to the power and influence, if not sheer dictation, of the defendant, and her condition must have been known to him, if the testimony is credible. If any mental operation of importance was required in the transaction, it was practically all on his side. It seems that he could, at his will and pleasure, mould her resolutions, if she had any, to suit his own designs, so like was she to clay in the hands of the potter. It is needless to prolong the decision. To be sure, there was evidence in conflict with that offered by the plaintiff, but we are considering the version of the facts as presented by the plaintiff's proof, *Page 517 
which may be accepted by the jury to the utter rejection of the defendants, and we are not called upon to go farther than to hold that there is some evidence in support of the plaintiff's allegations. We need not refer any more to Sprinkle v. Wellborn, except to remark that it bears a strong resemblance to this case in some particulars, and that there is one fact which is shown by the defendant's declarations in this case which did not appear in that one, viz., the knowledge of the defendants that plaintiff was weak-minded and unable to manage his own affairs, for they stated to one, at least, of the witnesses, that Ageron Charles Lamb was not competent to take care of the money they paid, and for that reason they had agreed to pay it in monthly installments of $15. It must not be forgotten that there is proof in the case that the amount paid was only about one-eighth of the value of plaintiff's interest in the land, and only one-half, if we adopt the lowest estimate of one of his witnesses. There was, therefore, some evidence that the plaintiff was an imbecile and, whether from natural weakness or the excessive use of morphine, he was deprived of the mental capacity the law regards as necessary to the execution of a deed. But whether or not he had mind enough to act for himself in the transaction, there was evidence of his mental weakness, of great inadequacy of consideration, and of marked inequality between the two men of presumably normal minds and intellectual grasp on (446) the one side, and this weakling on the other, with some other circumstances of more or less importance, showing that a fraudulent advantage was taken of him in securing his deeds.
Whether there is any difference, in moral quality, between the act of obtaining a deed for land from one known to be totally bereft of reason and mental capacity and that of procuring one from a person merely of weak understanding, but of such feeble mind as to be unable to guard himself against imposition or to resist importunity and to take care of his interests, it does not lie within our province to decide, but, in law, and in so far as the validity of such a transaction may be involved, where there are elements indicative of fraud and dishonesty, we know that there is not and should not be any difference, if the jury, who are the triers of the facts, find that there was actual fraud, and in either case a court of equity will rescind the contract and cancel the deed or require the vendee to surrender what he has unfairly and unjustly received, with proper deduction for any sums paid out by him, if the specific remedy of rescission or cancellation cannot be equitably administered.
We have proceeded upon the assumption that the evidence which tends to establish the plaintiff's contention is true, and that the jury would have so decided if the case had been submitted to them, which is *Page 518 
the proper way to consider it. The defendant, at the next trial, may be able to rebut the plaintiff's evidence and to satisfy the jury that the transaction was perfectly fair and honest, and that no undue advantage was taken of the plaintiff, but that he had sufficient mental capacity to understand the nature of the transaction, its scope and effect, and that while he may have acted with poor judgment and discretion, and made a sorry bargain, it was not because of any natural insufficiency or impairment of his mental faculties caused by his habits or the low state of his health. We express no opinion as to the weight of the evidence, but simply hold that the nonsuit was improper. It will be set aside and a new trial granted.
New trial.
Cited: Ray v. Patterson, 170 N.C. 228; Champion v. Daniel, 170 N.C. 332;Grimes v. Andrews, 170 N.C. 523; Poe v. Smith, 172 N.C. 73; Johnsonv. Johnson, 172 N.C. 531; Boone v. Lee,175 N.C. 384; Rush v. McPherson,176 N.C. 565; Long v. Guaranty Co., 178 N.C. 506; Montgomery v. Lewis,187 N.C. 581; Speas v. Bank, 188 N.C. 529; Corp. Com. v. Trust Co.,193 N.C. 700; Gilliken v. Norcom, 197 N.C. 9; Hampton v. Bottling Co.,208 N.C. 332; Ins. Co. v. Morehead, 209 N.C. 177; Freeman v. Ball,219 N.C. 330; Waste Co. v. Henderson Bros., 220 N.C. 439; Carland v.Allison, 221 N.C. 123; Davis v. Davis, 223 N.C. 38.