WILEY RUSH ET AL. v. T. B. McPHERSON.

(Filed 4 December, 1918.)

1. **Evidence—Nonsuit—Trials.**

    The trial judge should consider the evidence in the light most favorable to the plaintiff, upon motion to nonsuit, and the motion should be denied if, so considered, it is sufficient to sustain the plaintiff's cause of action.

2. **Same—Contracts—Immoral Contracts—Fraud.**

    While the law will not enforce a contract which it prohibits as immoral or fraudulent, a motion as of nonsuit upon the evidence will be denied when there is evidence in the plaintiff's favor that he entered into the contract upon other and lawful motives, as where there is evidence that he had contracted with the purchaser at a commissioner's sale of land to have the bid assigned to him and receive the deed therefor, upon his paying the purchase price, after several attempts to sell the land had been made, without result, etc., and this with a lawful motive, and although there was evidence that his purchase, in this manner, tended to delay or defeat his judgment creditor while he was attempting to compromise the debt, it being a matter for the jury.

3. **Contracts—Sales—Trusts and Trustees—Resulting Trusts—Vendor and Purchaser—Deeds and Conveyances.**

    An agreement between the plaintiff and the purchaser at a commissioner's sale of land that the latter assign his bid to the former and have the deed made to him upon payment of the purchase price, rests upon the express contract of the parties, and does not involve the principles relating to resulting trusts, as where the purchaser uses the money of another and takes the title, by deed, to himself.

**4. Contracts—Parol Agreements—Statute of Frauds—Equity—Deeds and Conveyances—Cloud on Title—Sales—Assignment of Bid.**

Where it has been established that the defendant, a purchaser at a commissioner's sale of land, was under a parol agreement with the plaintiff's deceased ancestor to assign his bid to him and have the deed made to him direct, upon his paying the purchase price, and that this had been done and the deed thus made had been lost; that the plaintiff's ancestor and the plaintiff had continuously enjoyed peaceful adverse possession of the land for many years, and that fourteen years after the completion of the transaction the defendant had acquired a deed from the commissioner to himself: *Held,* a suit in equity will lie to have the defendant declared a trustee for the plaintiff's benefit and to remove the defendant's deed as a cloud upon the plaintiff's title. Under evidence in this case, a decree providing for the reimbursement of the defendant is held to be sufficient.

**5. Sales — Assignment of Bid — Contracts — Parol Agreement—Trusts and Trustees—Equity.**

It is against equity and good conscience to permit a purchaser of land at a commissioner's sale to repudiate his agreement to assign his bid to another and have conveyance made direct to him upon the payment of the purchase price, because the agreement rested in parol, and thus set up the statute of frauds, to his own advantage, in repudiation of the parol trust he had assumed.

ACTION, tried before *Webb, J.,* and a jury, at March Term, 1918, of RANDOLPH.

Plaintiffs, as heirs of Wiley Rush, Sr., deceased, brought this action to have the defendant, T. B. McPherson, declared a trustee for the plaintiffs of a tract of land on the waters of Cedar Fork Creek, containing 50 acres, adjoining the lands of B. J. Fisher and others, and for other relief, upon the ground that McPherson bid off the land at a sale made in December, 1891, by J. S. Cox, commissioner, for their ancestor, Wiley Rush, Sr., and assigned his bid to Rush, and the commissioner executed a deed to Rush for the land, which was lost before its registration. In 1905, McPherson procured a deed from J. S. Cox, commissioner, for the same land. Plaintiffs also ask that this deed be declared a cloud on their title and be canceled.

The jury rendered the following verdict:

1. Did J. S. Cox, commissioner, execute and deliver to Wiley Rush a deed to the Tucker land? Answer: "Yes."

2. Did Wiley Rush and T. B. McPherson, at or before the public sale of the Tucker land on 7 December, 1891, by J. S. Cox, commissioner, agree that T. B. McPherson should bid off the land for Wiley Rush? Answer: "Yes."

3. Did T. B. McPherson transfer his bid for the land to Wiley Rush? Answer: "Yes."

4. Who paid the purchase money for the Tucker land which was sold

at the commissioner's sale on 7 December, 1891? Answer: "T. B. Mc-Pherson."

5. Is plaintiff's right of action barred by the statute of limitations? Answer: "No."

6. What damage, if any, have plaintiffs sustained by the cutting of timber on the Tucker land by the defendant? Answer: "Nothing."

Judgment was entered upon the verdict, and defendant appealed.

*I. C. Moses and Brittain & Brittain for plaintiffs.*
*Dockery & Wildes for defendant.*

WALKER, J., after stating the case :· The defendant moved for a non-suit upon the ground that one of the plaintiffs' witnesses had testified that Wiley Rush bought the land through him partly for the purpose of concealing the fact that he owned it until he could effect a compromise of a certain debt which was then pending. The witness further said that this was not his only reason, though it had something to do with it. The land was sold three times, and nobody would buy it, and Wiley Rush, Sr., said if they could not find a buyer that he would take it. There was evidence sufficient to show that McPherson bid in the land for Wiley Rush, Sr., assigned the bid to him, and that the commissioner thereupon executed a deed to Rush for the land, which has been lost.

The court was right when it refused the nonsuit, as in the state of the evidence it could not properly do so. There was evidence apart from that as to the reason of Wiley Rush, Sr., for buying the land through McPherson as his agent which would have been sufficient to sustain a verdict for the plaintiff. The judge could not base a nonsuit on only a part of the evidence. His duty was to examine the evidence and see if any view of it the plaintiff could recover, and in doing so he should have rejected all of it which was favorable to the defendant and consider only that which was favorable to the plaintiff, as the plaintiff was entitled to the most favorable view of the evidence and to have the part most favorable to him taken as true. The decisions to this effect are very numerous.

We held in *Brittain v. Westhall,* 135 N. C., 492: "On a motion to nonsuit or to dismiss under the statute, which is like a demurrer to evidence, the court is not permitted to pass upon the weight of the evidence, but the evidence must be accepted as true and construed in the light most favorable to the plaintiff, and every fact which it tends to prove must be taken as established." *Daniel v. R. R.,* 136 N. C., 517; *Biles v. R. R.,* 139 N. C., 528; *Freeman v. Brown,* 151 N. C., 111; *Morton v. Lumber Co.,* 152 N. C., 54; *Lloyd v. R. R.,* 166 N. C., 24;

*Chrisman v. Hilliard,* 167 N. C., 4; *Lamb v. Perry,* 169 N. C., 436.

We said in *Collins v. Casualty Co.,* 172 N. C., 543, at p. 546: "The motion for a nonsuit on the evidence was properly denied. There was evidence in the case upon which the jury could return a verdict for the plaintiff, as the evidence upon such a motion must be construed most favorably in behalf of the plaintiff, and if in any reasonable view of it he is entitled to recover it should be submitted to the jury."

The rule, as thus stated, is applicable in this case. There is a view of the evidence which, if adopted by the jury, entitled plaintiffs to recover or to a favorable verdict upon the issues. They might have found all the facts stated in the complaint and appearing in the evidence and refused to find that Wiley Rush, Sr., was attempting to deceive or defraud his creditors. This would have sustained plaintiff's cause of action. A plaintiff can be nonsuited only when the evidence in no aspect of it is legally sufficient to justify a verdict in the plaintiff's favor. *Kearns v. Ry. Co.,* 139 N. C., 470. We are, therefore, compelled to affirm the judge's ruling by which he declined to nonsuit the plaintiffs.

The principle under which contracts tainted with fraud are repudiated by the law is well stated and discussed by *Justice Hoke* in *Marshall v. Dicks,* 175 N. C., 38, where it is said: "It is the fixed principle with us and, so far as we are aware of all courts administering the same system of laws, that when the parties are *in pari delicto* they will not enforce the obligations of an executory contract which is illegal or contrary to public policy or against good morals. Nor will they lend their aid to the acquisition or enjoyment of rights or claims which grow out of and are necessarily dependent upon such a contract," citing *Fashion Co. v. Grant,* 165 N. C., 453; *Pfeifer v. Israel,* 161 N. C., 409; *Lloyd v. R. R.,* 151 N. C., 536; *Edwards v. Goldsboro,* 141 N. C., 60; *Culp v. Love,* 127 N. C., 457; *King v. Winants,* 71 N. C., 469; *Blythe v. Lovinggood,* 24 N. C., 20; *Sharp v. Farmer,* 20 N. C., 255; *McMillan v. Hoffman,* 174 U. S., 639-654; *Battle v. Nutt,* 29 U. S. (4 Pet.), 184; *Armstrong v. Toler,* 24 U. S., 258 (11 Wheat.); 1 Waits Act. and Def., 43.

In *King v. Winants, supra,* it was held "that the law prohibits everything which is *contra bonos mores,* and, therefore, no contract which originates in an act contrary to the true principles of morality can be made the subject of complaint in courts of justice."

The Court said in *Blythe v. Lovinggood, supra,* that "an executory contract, the consideration of which is *contra bonos mores,* or against the public policy or the laws of the State, or in fraud of the State, or of any third person, cannot be enforced in a court of justice." And in *Sharp v. Farmer, supra,* that "No action can be sustained in affirmance and enforcement of an executory contract to do an immoral act or one

against the policy of the law, the due course of justice, or the prohibition of a penal statute." This defense, though, is allowed, not for the sake of the defendant but of the law itself. It will not enforce what it has forbidden. Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is that the law will not lend its support to a claim founded on its violation. *Coppel v. Hall,* 74 U. S., 542; *Cansler v. Penland,* 125 N. C., 578.

While this rule is well established and inexorably enforced when the parties are *in pari delicto,* it does not, as we have seen, apply to this case, as the motion to nonsuit is unavailing upon the grounds already stated. We do not mean to say that the evidence is very clear and distinct as to the alleged immoral act. Under the evidence of the witness, the jury could well have found that there was no such wrong committed, and that Wiley Rush, Sr., had another and perfectly legal motive.

There is no finding in the verdict that Wiley Rush, Sr., destroyed his deed, or even suppressed it, nor is there any resulting trust, because the jury have found that the defendant McPherson purchased the land as the agent of Rush and assigned his bid to him, and the commissioner conveyed to him. This rebuts the idea of a resulting trust in favor of McPherson. It appears from the findings that Rush, and not McPherson, was to be the owner of the land under a contract or agreement between them to that effect. It is not simply the case where one buys and takes the title in his own name, while another pays the money, with no contract in regard to the title or ownership of the land. Here there was an express trust, and by it the beneficial, as well as the legal interest, was to vest in Rush. *Kelly v. McNeill,* 118 N. C., 349; *Owens v. Williams,* 137 N. C., 165; *Sykes v. Boone,* 132 N. C., 199; *Avery v. Stewart,* 136 N. C., 436; *Davis v. Kerr,* 141 N. C., 11.

The plaintiffs not only show the express contract of McPherson to act as agent and buy and hold for Rush, but there is ample evidence of their and their ancestor's possession for many years, from 1891 to 1915, and no claim by McPherson during that long period, and surely no assertion of his right by action. And again, he did not get his deed from the commissioner until fourteen years after the sale. The judge, in the decree, has provided for the reimbursement of McPherson, and this is sufficient.

It is said by *Justice Reade* in *Cohn v. Chapman,* 62 N. C., 92, and so held by the Court, that "A parol agreement between A. and B. that A. will purchase land for B. and take the title to himself and hold it for B. until the latter can pay for it, and when paid for will convey it to him, is such an agreement as equity will enforce. And such, substantially, is the agreement in this case," citing *Lyon v. Chrisman,* 22 N. C.,

268; *Hargrave v. King,* 40 N. C., 430; *Cloninger v. Summit,* 55 N. C., 513. See, also, *Harrison v. Emory,* 85 N. C., 161; *Boyd v. Hawkins,* 37 N. C., 304; *Williams v. Avery,* 131 N. C., 188.

There was evidence that in fact Rush did pay the purchase money, but that is immaterial in view of what has been said; but we should call especial attention to the doctrine in this State, as expressed in *Mulholland v. York,* 82 N. C., 510, where it was held that where one purchases at an execution sale, under a parol agreement, that he will hold the land for another and convey to him upon repayment of the purchase money, a trust is created between the parties which will be enforced in a court administering equitable principles, and the purchaser at the sale will be decreed to perform his promise and convey to the other party on payment of the purchase money, although he has since purchased the same property at a bankrupt sale himself, and *Chief Justice Smith* very pertinently and significantly inquired: "Can a trust attaching to land be created by a parol contract entered into between the debtor and his attorney, that the latter will buy the debtor's land at the execution sale, hold for his benefit, and reconvey on being reimbursed the money paid for it?" He thus answers his own question: "In our opinion, a trust may be thus formed, and it will be enforced on the ground of fraud in the purchaser in obtaining the property of another under a promise to allow him to redeem, and attempting afterwards to appropriate it to his own use. The principle is illustrated in several cases in our own Reports, which will be briefly adverted to," citing *Turner v. King,* 37 N. C., 132, where *Judge Daniel* said: "The attempt of the defendant to set up an irredeemable title after the agreement he entered into is such a fraud as this Court will relieve against."

If the defendant McPherson had not made the promise to act as his agent and buy the land for Rush, the latter would in all probability have arranged to be present and buy for himself. An agent cannot thus unfaithfully deal with his principle by lulling him into security and inducing him to act upon his plighted word, and then avail himself of the breach of his promise by setting up the statute of frauds as a defense. "The statute," said this Court by *Chief Justice Pearson,* "was passed to prevent fraud, and not to encourage it." *Threadgill v. McLendon,* 76 N. C., 24. It does not apply to such trusts. The defendant McPherson had agreed to assume a confidential relation towards the plaintiff's ancestor, as his agent, to buy the property, and the law will not allow him to abuse it by buying the property himself in repudiation of his trust, thus deceiving and misleading his principle. We cannot follow precedents in other jurisdictions where their statutes may be different. Our rulings we think are more in harmony with just, correct and equitable principles. We add a few very direct authorities to those

already cited: *Barnard v. Hawks,* 111 N. C., 338; *Avery v. Stewart,* 136 N. C., 426; *Sandlin v. Kearney,* 154 N. C., 596; *Hargrave v. King,* 40 N. C., 436; *Cheek v. Watson,* 85 N. C., 198.

In *Barnard v. Hawks, supra, Shepherd, C. J.,* who we know had a clear conception of the law of trusts, and who always enlightened us when he wrote upon the subject, states the doctrine thus: "Even had this been land, and defendants had paid the purchase money and taken the title under a parol agreement to hold it for the plaintiff, subject to his right to repay the purchase money, the court, upon sufficient testimony, would have declared them trustees. This was substantially decided in *Cohn v. Chapman,* 62 N. C., 92 (93 Am. Dec., 600), in which it was held, upon the principle of trust, that such an agreement was not within the statute of frauds."

This Court said in *Avery v. Stewart, supra,* at p. 440, 441: "If the plaintiff had known that defendant intended to betray him by a false promise, and thus to deceive him into the adoption of a course of action which otherwise he would not have taken, he would not have placed any trust in the defendant, but would have arranged with some other and more reliable person in order to secure the same benefit. To permit the defendant to profit by such a betrayal of confidence so implicitly reposed in him would be not only inequitable, but a reproach to the administration of justice," citing *Johnson v. Hauser,* 88 N. C., 388; *Shields v. Whitaker,* 82 N. C., 516; *Thompson v. Newlin,* 28 N. C., 338 (42 Am. Dec., 169); *Cook v. Redman,* 37 N. C., at p. 623; *Cobb v. Edwards,* 117 N. C., 244; *Williams v. Avery,* 131 N. C., 188.

The same doctrine was substantially declared in *Cheek v. Watson, supra,* where *Chief Justice Smith,* after stating that where a purchase is made at a sale under a former promise that it shall be for another, who relies upon the promise and does not attend the sale and bid for himself, a trust arises not affected by the statute of frauds, says: "The trust would equally arise where the party relying upon the assurance is prevented from making arrangements with others by which he could have secured the same benefits promised by the purchaser."

To every one who has deliberately undertaken to act as an agent for another, his *trust* should be a sacred charge, not to be regarded with a covetous eye, but with unselfish fidelity to him for whom he has agreed to act. *McLeod v. Bullard,* 84 N. C., 515.

We have discussed the material questions and conclude that there was no error at the trial.